**PI ELECTRONICS CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–664C.

United States Court of Federal Claims.

Sept. 10, 2002.

Lonnie L. Simpson, Tampa, FL, for plaintiff, Robert J. Cynkar, Hamish P.M. Hume, Victor J. Wokski, Cooper & Kirk, Washington, DC, of counsel.

Gregory T. Jaeger, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant, Zoe Strickland, United States Postal Service, of counsel.

## OPINION

MILLER, Judge.

After a trial in September 1999, a supplemental evidentiary hearing in September 2000[1] concerning the authenticity of a key document and the veracity of a key witness, and an unfruitful 17–month effort to resolve the case before a settlement judge, this case calls for a decision on liability. Four issues are addressed: (1) whether the United States Postal Service (the "USPS") wrongfully terminated plaintiff's market test contract for a proprietary automated postage and mailing machine; (2) whether the USPS frustrated the contract by failing to implement advertising; (3) whether plaintiff itself breached the contract by misdirecting funds dedicated to a media campaign, by failing to pay royalties, and by failing to pay pick-up fees; and (4) whether the USPS disclosed plaintiff's proprietary and confidential information in contravention of the terms of the market test contract.[2]

That this case comes to a ruling long after the closing of proofs is attributable to an alternative dispute resolution ("ADR") effort into which the parties propelled the case beginning in November 2000 and formalized by reference in January 2001. The effort ultimately proved futile. Despite this court's requirement that the parties report to the court periodically on the progress of their ADR endeavors, their final report of June 14, 2002, pronounced the last rites on this process. Thus, June 14, 2002, became the date that triggered the issuance of an opinion within 90 days.

The impact of this delay on resolving the case post-trial was potentially withering. Resolution of plaintiff's claims relies in large part on percipient testimony, and the probativeness of such witnesses could not be expected to be recaptured from a record cold after of almost three years since the principal trial in 1999. Fortunately, the court was able to record findings within 90 days of the 1999 trial. See Transcript of Proceedings, *Pi Elecs. Corp. v. United States*, No. 96–664C, at 606 (Fed.Cl. Sept.27, 2000) (hereinafter "Tr."). Similarly, the court proceeded to incorporate findings from the 2000 evidentiary hearing until the parties requested a status conference on November 2, 2000, to discuss settlement and thereafter filed a joint motion on January 17, 2001, to refer the case to ADR. While this opinion does not bear the full brunt of the overall delay, no interest—that of the parties, the court, or justice—has been served by postponing an opinion on

1. The hearing was denominated as a hearing on plaintiff's motion to reconsider the November 5, 1999 order that 1) denied plaintiff's challenge to the authenticity of evidence and 2) denied plaintiff's request to produce evidence on its takings theory of liability. See Order entered on Mar. 7, 2000.

2. Because defendant was not prepared to address plaintiff's evolving damages proofs, the court, incident to trial and pursuant to RCFC 42(c), as then in effect, bifurcated the trial so that plaintiff's claims of liability would be tried separately from damages. The ruling did not include defendant's counterclaim. See Order entered on Sept. 29, 1999, ¶ 1.

liability over such a lengthy period.[3]

This opinion rules that the contract was terminated properly and the USPS did not frustrate or hinder its performance. Plaintiff's failure to perform its obligations under the contract renders it liable to the USPS for the royalty fees and repayment of a dedicated advertising advance. However, the plaintiff is not liable to the USPS for the delinquent pick-up fees, and the USPS is liable for plaintiff's expenses regarding the purchase of 485,000 undelivered mailers. The evidence adduced in the supplemental evidentiary hearing justifies allowing plaintiff to file an amended complaint to plead a taking of its property and to try that claim.

## FACTS

### 1. *Background*

James Wetherington, General Manager, Research and Engineering Division, Office of Procurement of the USPS, and Bogdan Jonic, Program Manager, Retail Equipment Division of the USPS, visited representatives of Pi Electronics Corporation ("plaintiff") in Houston, Texas, on June 27, 1991. The visit was intended to introduce the USPS to the Zipster Plus (the "Zipster"), an automated postage and mailing machine developed by plaintiff. Plaintiff hoped to impress the USPS with the Zipster, and to induce the company to purchase the machines from plaintiff.

The separate trip reports filed by Messrs. Wetherington and Jonic show that they were impressed by what they encountered during their visit. In his June 27–28, 1991 trip report, Mr. Wetherington noted that "the Zipster is already well designed and built, easy to use and maintain, and technologically superior" to other automated postage and mailing machines in existence at that time. Mr. Jonic's corresponding June 27–28, 1991 trip report focused on the Zipster's capabilities, functions, and operations, and also concluded that the Zipster is "well designed, highly technical and easy to operate." While the defense case is predicated on Statements of Work for postal mailing machines that the USPS developed through its contractors or own employees, and that allegedly pre-dated the Zipster Statement of Work (the "Zipster SOW") and anticipated all of its allegedly proprietary functionalities, plaintiff's evidence that USPS personnel viewed the Zipster as a novel solution and exciting prospect was not only consistent, but impressive.

Drafting of the Zipster SOW commenced in August 1991 when John B. Daron, plaintiff's Vice President of Engineering, sent Mr. Jonic a letter dated August 2, 1991, listing the Zipster's specifications and containing a design drawing labeled "proprietary and confidential." Just over two weeks later, plaintiff sent a Zipster prototype to the USPS facility in Merrifield, Virginia ("Merrifield"). John Croarkin, who was overseeing the project for the USPS at Merrifield, and Daniel A. Wilson, a contract electronic engineer who was designated by the USPS to evaluate the Zipster, used the prototype to draft the Zipster SOW. According to Mr. Wilson, Mr. Croarkin used previously drafted Statements of Work to generate verbatim sections of the Zipster SOW. Messrs. Croarkin and Wilson finished a draft Zipster SOW on September 20, 1991. The final Zipster SOW was completed on October 18, 1991.

Larue D. Coleman, a shareholder in plaintiff since 1985 who joined plaintiff's board of directors shortly thereafter, testified that plaintiff was very concerned with confidentiality. Mr. Daron discussed at length plaintiff's efforts to enhance security and to protect its confidential material. Plaintiff kept its doors locked at all times and protected its premises with security alarms. Computers were password protected. It required visi-

---

**3.** Plaintiff changed counsel several times before and after conclusion of the 1999 trial, and defendant changed counsel once after that trial. Furthermore, plaintiff has confused the proceedings by linking its effort to transmute its theory of the case into a taking, pursued since 1997, with its challenge to the authenticity of evidence. *See* Orders entered on Oct. 31, 1997; June 27, 1999; Mar. 9, 1999; Sept. 15, 1999; Nov. 5, 1999;

June 18, 2002. Defendant is responsible for the need for the supplemental evidentiary proceeding in 2000. Because both parties are chargeable with delay, it is significant that both parties at the close of the 2000 evidentiary hearing requested retrial of the issues implicated by that hearing. *See* Tr. at 584 (plaintiff), 605 (defendant).

tors who had access to the Zipster to sign nondisclosure and proprietary information protection agreements. For example, Geraldine A. Shaw of Shaw Software, who in 1997 became a shareholder and officer of plaintiff, was required to sign a nondisclosure agreement when plaintiff first permitted her to examine the Zipster. Similarly, when Messrs. Wetherington and Jonic visited Houston to see the Zipster, they were asked to sign nondisclosure agreements, although no evidence was provided that such agreements were signed. Mr. Daron testified that Messrs. Wetherington and Jonic indicated that disclosure of proprietary information by them would subject them to civil and criminal penalties; however, in a stipulation of expected testimony, Mr. Jonic stated that he lacked any recollection of making such statement. Stipulation of Expected Test. of Bogdan Jonic, filed Aug. 10, 2000.

Asher Gil, plaintiff's president, testified that every document that plaintiff thought was proprietary and confidential carried a proprietary and confidential legend. Mr. Daron testified that he marked as proprietary and confidential every document that he sent to the USPS. He testified persuasively that he submitted sufficient information for the USPS to build its own Zipster.

On October 24, 1991, plaintiff and the USPS entered a contract for a market test of the Zipster, Contract No. 104230–92–O–0766. Mr. Wetherington was the contracting officer for the market test contract. Paragraph 11(c) of the market test contract required plaintiff to pay a $4.50 daily pick-up fee for each Zipster and to pay the face value of all postage purchased at the Zipsters. Para-

graph 11(b) mandated the payment of a fixed royalty of $425,000.00. Modification M03 to the contract also required plaintiff to generate regular reports about each Zipster's performance. The contract provided that "[i]f [plaintiff], at any time during the term of this contract shall fail to comply with or fulfill any of the terms or conditions hereof, USPS may, at its discretion, terminate the contract for cause." For its part, the USPS was required to collect the mail deposited in the Zipsters, to assist in an advertising campaign, and to keep plaintiff's proprietary information confidential.

In January 1992 the USPS performed first-article testing on a production version of the Zipster. The USPS discovered many problems with the Zipster, including: 1) potential safety hazards; 2) illegibility of meter stamp impressions; 3) access problems for those with disabilities; and 4) scale inaccuracy.[4] In total, the final report on the first-article testing recounted 16 deficiencies.

The USPS apparently was willing to overlook the deficiencies in the first-article testing. For example, it waived certain deficiencies by Modification M03, dated March 3, 1992. By letters of March 25 and 27, 1992, the USPS allowed Zipsters to be deployed for the market test without resolution of other deficiencies.[5]

In order to perform the market test, plaintiff had to produce several Zipsters.[6] Plaintiff selected General Kinetics, Incorporated ("GKI"), an electronic and mechanical defense contractor located in Florida, as its contractor for the manufacture of the Zip-

---

**4.** Although the final report indicated a deficiency regarding the scale, this aspect of the report is incorrect. During its first-article testing, the USPS tested the Zipster's scale with Troy ounces, even though the scale's calibration and sensitivity were to be tested against standard ounces. Although this error in testing was discovered by Mr. Gil when he visited Mr. Wilson at Merrifield to address the alleged scale inaccuracy, USPS witnesses were unable to confirm that this correction made its way into the final report. On that basis the court does not consider the reported failure of the scale to be an actual failure of the scale.

**5.** A March 18, 1992 USPS letter regarding deployment in Houston, Texas, required plaintiff to certify its compliance with safety standards set forth in an attached Certificate of Compliance. However, the March 25 and 27, 1992 USPS letters concerning deployment in, respectively, Austin and San Antonio, Texas, and Denver, Colorado, made no mention of the safety compliance certificates.

**6.** The original market test contract required plaintiff to "[c]omplete deployment and installation of not less than 35 and up to 50 (± 5) [Zipster] unit(s)." It is undisputed that plaintiff produced only 30 Zipsters for the contract.

sters.[7] Under the contract the USPS advanced $450,000.00 to plaintiff, which, in turn, purchased 30 Zipsters from GKI at $15,000.00 per unit.

Originally, the market test was to run from on or about November 15, 1991, to March 31, 1992. Pursuant to Modification M03, dated March 3, 1992, the market test was rescheduled to begin on or about March 15, 1992, and to end no earlier than July 31, 1992, and no later than September 15, 1992. In spring 1992 plaintiff introduced the first Zipster to the public at the Rice Food Market in Houston. On November 9, 1992, the parties again modified the termination date of the market test, extending the test until February 28, 1993.

During the test plaintiff failed to perform many of its contractual obligations. On May 18, 1992, Mr. Wetherington gave plaintiff written notice of plaintiff's multiple failures under the contract. He informed plaintiff that adequate funding was not being kept on deposit for the pick-up fees, that postage meter dates were not being kept current, that promotional brochures were not being addressed properly and did not contain a contact number, that advanced approvals of proposed deployment sites were not being requested in a timely fashion, and that required reports had not yet been filed.

With regard to the pick-up fees, plaintiff opened "trust accounts" from which various post offices could withdraw the pick-up fees as they came due to the USPS. For a period of time, plaintiff kept adequate funds in the trust accounts. However, according to Frederick J. Hintenach, III, General Manager of USPS Retail Operations Support, by early December 1992 plaintiff was not paying the pick-up fees on time. In fact, as of December 4, 1992, plaintiff was $2,154.40 behind in its payments to the San Antonio post office,

$317.00 behind in Austin, and $272.00 behind in Houston. Plaintiff was still in arrears when Mr. Wetherington issued a December 29, 1992, written ultimatum threatening termination if arrearages were not brought current by January 4, 1993. David F. Letts, a contract administrator working for the USPS services procurement department, sent plaintiff a facsimile transmission on January 14, 1993, to indicate that since the arrearages had continued, the test would be terminated. Mr. Gil did not deny falling behind on pick-up fees, but asserted that the fees were eventually paid by one of plaintiff's investors, Mr. Coleman.

Additionally, plaintiff did not supply the reports required under Modification M03 to the contract. Under Modification M03, plaintiff was to supply to the USPS weekly transaction reports, weekly error log reports, and monthly performance reports that included information about machine downtime, maintenance, and repair. Weekly reports were due to the contracting officer on the Wednesday following the reported week; monthly reports were due on the 15th following the reported month. Although plaintiff was able to generate some monthly reports, it never was able to do so in a timely fashion.[8] No weekly reports were entered into evidence by either party, leading this court to find that not a single sales and error report was generated on a weekly basis as required under Modification M03.

After more than nine months of the market test, Mr. Wetherington terminated the contract by letter on January 15, 1993. The letter recounts the plaintiff's failure to pay pick-up fees and to comply with reporting requirements as the bases for termination. According to January 14, 1993 correspondence from Mr. Letts to the Retail Market-

---

7. Mr. Wetherington's level of involvement in plaintiff's decision to select GKI is disputed. According to Mr. Daron, Mr. Wetherington mandated that plaintiff use GKI when the market test contract was signed. Mr. Gil testified, and answered at an earlier deposition, that Mr. Wetherington "suggested" that plaintiff call his acquaintance, Walt Saltzman, who was affiliated with GKI, because Mr. Saltzman possibly could convince GKI to finance the manufacture of the Zipsters.

8. The monthly reports submitted by plaintiff were sporadic, at best. The June 17, 1992 report addresses sales and errors for the month of May, 1992; the July 25, 1992 report details sales and errors for the month of June 1992; the August 11, 1992 report provides sales and error information for the month of July 1992; and the December 7, 1992 report contains sales and error data for the month of November 1992.

ing Specialists in Houston and Denver, the locks were to be removed from the Zipsters after one final mail pick up, and a sign reading "MARKET TEST COMPLETE; OUT OF SERVICE" was to be placed on each machine. By the end of January, all Zipsters were removed from the field.

In March 1993 plaintiff generated a "final report" on the test market contract. Plaintiff's report concluded that the test had been "successful in meeting the stated design parameters and objectives" that were set forth in the market test plan. Mr. Letts, however, countered this conclusion when he pointed out that the final report could not serve as a substitute for the performance and maintenance reports plaintiff failed to file during the market test.

On April 9, 1993, plaintiff and the USPS entered into Modification M08, a repayment plan for the outstanding royalties and advances made by the USPS to plaintiff. On June 18, 1993, the USPS convened an industry meeting to gauge interest in an automated postage and mailing machine program. Under the program a contractor would receive a USPS license to operate its own automated postage and mailing machines under the auspices of the USPS. Present at the meeting were representatives of, among other companies, Honeywell, IBM Corporation, Klussendorf AG, Mettler–Toledo, and Paramax Systems. The USPS distributed a Statement of Work that was an altered form of the Zipster SOW. Plaintiff complained to postal inspectors about the release of what it considered its proprietary and confidential information in the distributed Statement of Work. Mr. Letts responded that he selected the Statement of Work as a good description of the performance capabilities of what the USPS wanted to license, not as a design specification of what it wanted to license. Eventually, the USPS notified all attendees of the June 18, 1993 meeting that it was not pursuing this licensing concept. In recent years the USPS has embarked on a contractual relationship to develop and install what plaintiff considers to be a derivative automated postage mailing machine.

2. *Procedural history*

Plaintiff filed the instant action on October 21, 1996, pled breach of contract and improper disclosure of proprietary and confidential information, and amended its complaint on March 31, 1998, to include allegations of loss of trade secret value, profits, and competitive advantage. While proceeding to trial, the parties engaged in a contentious discovery process and a slow winnowing of the issues, particularly plaintiff's damages theories.

Trial commenced on September 20, 1999. Unsatisfied with multiple rejections of its takings theory, plaintiff again sought to raise the takings issue, and the court admitted evidence that could underpin a takings theory if plaintiff justified proceeding on that ground. On September 24, 1999, trial on the liability phase of the bifurcated proceedings closed. On October 22, 1999, plaintiff filed an amended motion *in limine* seeking, *inter alia*, to present additional evidence on its takings theory based on new documents produced by the USPS. By order entered November 5, 1999, the court finally rejected plaintiff's takings theory, as plaintiff, in contravention of the court's direction during the trial, made no effort to identify specific documents supporting its takings argument. *See* Order entered on Nov. 5, 1999. Therefore, the proofs rested on plaintiff's claims of breach of contract and breach of non-disclosure and confidentiality obligations.

On November 29, 1999, plaintiff filed a motion for reconsideration of the November 5, 1999 order. The predicate of its motion was testimony of a defense witness. Shortly after Messrs. Wetherington's and Jonic's June 1991 visit to inspect the Zipster in Houston, the witness, Omar L. Dajani, then an engineering contractor for the Merrifield facility, drafted a Statement of Work for a "self-service mailing system" called the Postal Mailing Center–II. The Statement of Work for the Postal Mailing Center–II (the "PMC–II SOW") was dated July 19, 1991. Prior to drafting the PMC–II SOW, Mr. Dajani prepared a Statement of Work for the Quickpost (the "Quickpost SOW"), another automated postage and mailing machine. A letter date-stamped January 3, 1991, indicates that the Quickpost SOW was revised

pursuant to an October 30, 1990 meeting. The Quickpost SOW was dated December 17, 1990.

Plaintiff's motion for reconsideration rested on "newly received forensic evidence" that it asserts raises questions about the authenticity of the Quickpost SOW and the veracity of Mr. Dajani's testimony about his involvement with the Quickpost SOW and PMC–II SOW. Pl.'s Mot. filed Nov. 29, 1999, at 1. During trial, the USPS relied upon both of these Statements of Work to show that, prior to entering into the market test contract for the Zipster, it had working conceptual documents that included all of the features that plaintiff claims are proprietary to the Zipster.

Although trial had concluded, plaintiff took the position that Mr. Dajani's testimony concerning his involvement in the Quickpost SOW constituted surprise. After an understandable delay caused by the untimely death of plaintiff's counsel Donald Gunn, a gracious and skilled advocate, plaintiff, unperturbed by its failure to cross-examine the witness on point during trial, sought to reopen the proceedings based on forensic evidence and deposition testimony purportedly indicating that Mr. Dajani had falsified the Quickpost SOW presented at trial and/or prevaricated during his trial testimony. By order of March 14, 2000, the court granted plaintiff's motion for reconsideration and scheduled a supplemental evidentiary hearing for July 17, 2000, on the issues of the authenticity of the Quickpost SOW and the veracity of Mr. Dajani's testimony. The parties then spent two months disputing the court's various discovery orders, and plaintiff's counsel failed to appear at a status conference held on June 27, 2000. *See* Order entered on June 28, 2000. On July 10, 2000 the parties agreed to reschedule the evidentiary hearing to September 25, 2000. *See* Order entered on July 11, 2000. After trial ended on September 27, 2000, the court stayed any further proceedings on November 2, 2000 for purposes of settlement discussions. On January 17, 2001, the court granted the parties' joint motion to refer the case for ADR proceedings.

## DISCUSSION

### I.  *Breach of contract*

#### 1.  *Wrongful termination*

■  The market test originally was slated to run from on or about November 15, 1991, to March 31, 1992. The contract mandated that plaintiff pay: 1) a $4.50 daily pick-up fee for each Zipster; 2) the face value of all postage purchased at the Zipsters; and 3) a fixed royalty payment of $425,000.00. Plaintiff was also required to submit "data collection and report formats in accordance with the [Zipster] SOW."

The contract granted the USPS discretion to terminate the contract if plaintiff failed to comply or fulfill its terms. Modification M07 specifically warned plaintiff of the possibility of termination for failure to generate the test reports required by the contract or for failure to pay pick-up fees.

"In undertaking a contract, the contractor promises to perform according to the contract specifications, and the Government has the right to insist on contractor performance in compliance with them." *Jet Constr. Co., Inc. v. United States*, 531 F.2d 538, 543, 209 Ct.Cl. 200, 208 (1976). The instant contract required plaintiff to provide weekly and monthly reports about sales and maintenance at each Zipster; to pay a royalty fee; and to pay pick-up fees on a per-day, per-Zipster basis. Plaintiff failed to meet its contractual obligations with respect to each of these requirements. Plaintiff's witnesses conceded, and defendant demonstrated, that plaintiff was not meeting its reporting obligations. The record establishes that plaintiff did not pay the required royalty fee. Although plaintiff made some of the required payments for daily pick-ups, it fell in arrears in a number of locations, including San Antonio, Houston, and Austin. By December 4, 1992, total arrearages amounted to as much as $2,743.40, or approximately 610 days' worth of pick-up charges.

Plaintiff also failed at trial to establish that the termination was pretextual or otherwise improperly motivated. The direct testimony of both plaintiff's and defendant's witnesses support unmistakably a finding that the

USPS's termination of the contract was not wrongful.

### 2. *Frustration of purpose, hindrance of performance, and breach of good faith and fair dealing*

██ Although plaintiff styles its frustration of purpose, hindrance of performance, and breach of good faith and fair dealing claims as different grounds for relief, they turn on the same operative facts and therefore are discussed together.

During first-article testing, several incidents occurred that plaintiff now points to as evidence of frustration or hindrance of the contract, or bad faith on the part of the USPS personnel. These incidents include: 1) testing the Zipster's scale with Troy ounces instead of standard ounces; 2) removing a certain bolt which engaged a microswitch designed to prevent the Zipster's scale from tipping too far as it tilted a package toward the capture receptacle; 3) turning certain bolts in a fashion that prevented the Zipster from sensing whether its doors were closed or open; 4) jamming two credit cards into the Zipster's card reader; and 5) placing the Zipster and competitor machines in close proximity.

Regardless of the accuracy of plaintiff's claims about these events (and defendant offered substantial testimony to counter all of plaintiff's accounts), they do not rise to the level of frustration, hindrance, or bad faith. The record reflects that each of these incidents occurred during first-article testing. If the market test contract had been terminated after first-article testing based on these incidents, plaintiff's position might have more force.

The contract, however, was permitted to progress to the market test phase, during which plaintiff brought about the contract's termination owing to its failure to uphold its obligations under the contract. Although plaintiff did fail to prove that the termination for failure to pay pick-up fees and failure to issue required reports was pretextual, the court would be remiss in not noting that the personnel at the Merrifield facility treated plaintiff's Zipster in an off-hand fashion.

This finding potentially could have consequences for plaintiff's takings claim.

Plaintiff also points to the USPS's failure to meet its advertising commitments for the market test as evidence of frustration, hindrance and bad faith. Paragraph 8 of the contract provided for an advertising plan. It reads, "[t]he Contractor will develop an Advertising Plan which shall be provided to USPS for review and approval within 15 days after the effective date of this contract." Pursuant to paragraph 1(A)(b) of the contract, the plan necessitated the design and delivery of "mailable promotional brochures" in "an adequate quantity to cover the designated media area." Mr. Gil testified that, at the time the market test contract was signed, Mr. Wetherington indicated that plaintiff would produce the mailers, but that the USPS would deliver them. Mr. Wetherington further promised that the USPS would mail one million pieces of promotional mail under the G–10 permit, an indicia of free postage.

Plaintiff produced approximately 500,000 mailers, but was able to mail only 15,000 under the G–10 permit. After sending the 15,000 pieces of promotional mail, plaintiff was informed that the G–10 permit is for official USPS use only; a private corporation, such as plaintiff, does not qualify for the permit. Once again, the shop-worn tale is resurrected of a government representative who goes beyond his authority in providing a promise to a government contractor.

Finally, plaintiff points to the actions of Mr. Wetherington as evidence of bad faith on the part of the USPS. After the market test contract was terminated, Mr. Coleman, a major shareholder and member of plaintiff's board of directors, met with Mr. Wetherington in Washington, DC on April 23, 1993. This meeting was a follow-up to a conference call between Mr. Wetherington, Mr. Coleman, and Don Cox, also a member of plaintiff's board of directors. During the telephone call, Mr. Wetherington had asked Messrs. Coleman and Cox about their willingness to entertain outside investment opportunities, presumably in areas other than the postal field. When Mr. Coleman met Mr. Wetherington on April 23, Mr. Wetherington

disclosed that the investment would be in a company that would manufacture postal machines and sell them to the USPS. Mr. Wetherington shared a *pro forma* that listed four or five postal-related machines. Mr. Wetherington indicated that an acquaintance of his, Walt Saltzman, *see supra* note 7, would be a partner in the company, and that the required investment in the proposed company would be $10–15 million.

Mr. Coleman was concerned by Mr. Wetherington's advances and sought legal counsel. Moreover, Mr. Coleman recorded all telephone conversations from that point forward. In June or July 1993, Mr. Coleman relinquished the tapes and transcripts to USPS postal inspectors. In August 1993 Mr. Wetherington again contacted Mr. Coleman. Mr. Coleman expressed a need for more information, so Mr. Wetherington forwarded a 108–page business plan. Both Messrs. Wetherington and Saltzman telephoned Mr. Coleman to confirm its receipt. Mr. Coleman never heard from Mr. Saltzman after this call.

The USPS investigated the matter, allowed Mr. Wetherington to resign, and vehemently resisted any finding that could affect the outcome of plaintiff's case or reflect on the USPS's *bona fides.* Mr. Wetherington did not lead plaintiff into any breaching conduct or frustrate or hinder plaintiff's performance of the contract. As reprehensible as Mr. Wetherington's actions were, his violations of rules and regulations before the termination of the contract, *e.g.,* the G–10 permit, inured to plaintiff's benefit. Any violations that occurred after the contract's termination, *e.g.,* the alleged solicitation of investment funds, are not relevant to plaintiff's cause of action.

### 3. *Disclosure of proprietary and confidential information*

Plaintiff contends that when the USPS released a slightly altered version of the Zipster SOW at the June 18, 1993, industry meeting, the USPS breached the market test contract by disclosing proprietary and confidential information contained therein which was protected by paragraph 9 of the contract. Paragraph 9 provides:

*Confidentiality.* The Contractor and USPS agree, to the extent permitted by law, to safeguard proprietary, privileged or confidential information disclosed by one to the other. The disclosure of such information shall not be considered to constitute the transfer of ownership of that information. Such information includes, but is not limited to, marketing plans, business plans, software data, prototypes and other business or technical information. Such disclosed information may be used only for the purpose of this contract, and may be reproduced only to the extent necessary for that purpose. The receiving party agrees to restrict disclosure of such information to its employees on a need-to-know basis and to advise those employees of the obligations of confidentiality. Neither the Contractor nor USPS shall be liable for the inadvertent disclosure of such information, if such disclosure occurs despite the exercise of a reasonable degree of care which is at least as great as the care which a Contractor of USPS normally takes to preserve its own information of a similar nature. The restrictions of this Clause shall not apply to any information that: (a) the Contractor or USPS discloses to a third party without restriction; (b) is or becomes available to the public by any other means than unauthorized disclosures; or (c) is independently developed by the receiving party or its affiliated company.

Therefore, for disclosure of information to rise to the level of a breach of contract under the language of this clause, the information disclosed must not have been known to the USPS prior to its contract with plaintiff.

Mr. Dajani testified that he prepared the Quickpost SOW as of December 17, 1990. Shortly after Messrs. Wetherington's and Jonic's June 1991 visit to Houston to view the Zipster, Mr. Dajani drafted the PMC–II SOW, which is dated July 19, 1991. These Statements of Work are relevant because they illuminate what technology the USPS claims it independently possessed prior to August 1991, when it came into possession of the Zipster prototype. The USPS retained Mr. Dajani, formerly a contract employee, as

a computer systems analyst in August 1999 incident to the September 1999 trial.

Mr. Daron, plaintiff's Vice President of Engineering, defined the concept of "proprietary and confidential" to include engineering details, software, flow diagrams, and items that are unique, novel, or commercially valuable. He elaborated with specific examples, including "all the intellectual property and engineering results that are integral with the product that [plaintiff] has ownership of."

Joseph C. McAlexander, III, plaintiff's expert in trade secret protection, testified to nine proprietary features of the Zipster, information about which the USPS allegedly disclosed during the industry meeting.[9] Unlike Mr. Daron, plaintiff's able technical witness, Mr. McAlexander's credibility was undercut by the sheer range of attributes that he sponsored as unique to the Zipster. Some were demonstrable; others, fantastic. Each item of claimed proprietary information and defendant's evidence in response to plaintiff's proof of disclosure are addressed in turn.

First, Mr. McAlexander indicated that the ability of the Zipster to notify the USPS when it was at 70% capacity was a unique technological advantage. He testified that 70% was a very specific number that appears in no other Statements of Work before the Zipster SOW, and that the use of the 70% threshold as a notification trigger was proprietary information. Therefore, according to Mr. McAlexander, the inclusion of a 70% notification figure in the SOW distributed on June 18, 1993, was a violation of the confidentiality clause contained in the market test contract.

While Mr. Daron verified that the Zipster was able to call for pick up when the 70% capacity was reached, Mr. Wilson, who was responsible for testing the Zipster, indicated that it did not actually possess this function-

ality: "I never had it demonstrated for me. No one could show me how or if it worked. To my knowledge, that feature was not in the machine." Nonetheless, Mr. Wilson testified that the Postal Mailing Center ("PMC"), a precursor to the PMC–II which was actually built by the USPS; the PMC–II SOW; and the Quickpost SOW contained technology identical to the Zipster's sensor and notification ability. Mr. Wilson denoted this ability as a "host communications" capability, as it allowed the PMC, and would have allowed the PMC–II and the Quickpost, to request pick up when a preset amount of mail was collected.

If the USPS was not in possession this sensor and notification technology prior to its dealings with plaintiff, then the USPS might be liable for dissemination of plaintiff's proprietary information. The USPS, however, did possess such technology prior to the market test contract with plaintiff. Mr. Wilson testified that assembly of the PMC began between November 1990 and May 1991. His testimony is supported by Modification M17, dated November 2, 1990, to the Universal Stamp Vendor ("USV") contract and Modification M14, dated May 16, 1991, to the PMC contract. Modification M17 terminates all work on the USV contract and directs all resources to constructing the PMC, while Modification M14 contains an attached SOW for the PMC. Therefore, it is demonstrable that the USPS developed the PMC before May 16, 1991, more than a month prior to the initial meeting between plaintiff's representatives and Messrs. Wetherington and Jonic, and several months before the Zipster prototype arrived in Merrifield. The PMC contained host communications technology and the USPS developed such technology before its exposure to the Zipster.

The court fails to see the significance of the 70% figure as proprietary in and of itself.

9. Although Mr. McAlexander's expert report, filed on May 14, 1999, as part of plaintiff's responsive brief on summary judgment, contained 13 subparts, Mr. McAlexander testified only to nine features of proprietary information. The four that were omitted from his testimony, pursuant to the order of the court during trial, are not considered to have been placed in contention by plaintiff. For example, on cross-examination

Mr. McAlexander testified about plaintiff's claim that its magnetic card reader was proprietary and confidential. Although Mr. McAlexander conceded that the PMC–II SOW contained the same provision, this issue is not before the court because plaintiff did not elicit testimony concerning the magnetic card reader on direct examination of Mr. McAlexander when discussing his report.

So long as the USPS independently possessed the ability to set sensors at any number of levels before the capture bin was full, the selection and disclosure of 70% does not amount to a violation of paragraph 9 of the contract.

Finally, the mere presence of an item in the Zipster SOW does not make it part of the Zipster prototype upon which the USPS based the Zipster SOW. Put another way, the Zipster SOW could embody requirements beyond those which were present in the Zipster prototype. Although this is evidenced by the fact that the parties entered Modification M03, which waived certain provisions of the Zipster SOW for the market test, Mr. Wilson also addressed this issue directly:

THE COURT: I want you to explain to me, to the best of your understanding, although this was completed before you got there, what the general purpose of statements of work is in relationship to prototypes.

By that I mean is it intended to take a prototype, dissect it and mimic in writing what the prototype does, or does it go further and also state some desired requirements that the USPS might have, even though they are not embodied in the prototype?

THE WITNESS: A statement of work for something like this—the answer is yes. It could very well embody things that were not in the machine we were looking at. There's an instance or two in there where it's obvious that we were not thinking completely of Zipster when we created this statement of work.

THE COURT: In the past in your testimony you indicated one or two examples where in your view a feature was not in the Zipster prototype you studied, but was in the statement of work.

THE WITNESS: Yes.

THE COURT: What would that represent?

THE WITNESS: That represents something that Zipster could not yet do that we needed for it to do.

THE COURT: So to that extent I understand it is your position that everything in the statement of work is not something that the prototype claimed, represented?

THE WITNESS: Yes.

Second, Mr. McAlexander identified the Zipster's live, telephonic service option as proprietary. In essence, this feature allowed a customer who had difficulty with the Zipster to dial customer service directly from the Zipster by touching a help button on the screen. This feature, according to Mr. Wilson, was not contained in the prototype Zipster delivered for the Statement of Work preparation. Moreover, each initial Zipster placed in the market was labeled with a sticker that indicated a number to telephone for assistance, but the machines had no built-in communication device until later in the market testing period. Furthermore, plaintiff pointed to no evidence predating the Zipster SOW to demonstrate that plaintiff originated the idea for a telephonic help service.

Based on the lack of a help button on the prototype Zipster, the court finds that the USPS desired this feature, but that it was not present in the Zipster as originally designed and presented to the USPS by plaintiff in August 1991. Later release of this feature could not have disclosed plaintiff's proprietary and confidential information because it was not information that plaintiff had passed to the USPS under the contract. In fact, it appears to be a feature that plaintiff was never able to implement successfully on its own. The claim that its proprietary and confidential information was released when this feature was not in the prototype Zipster is perplexing, but nonetheless unsustainable.

Third, Mr. McAlexander addressed the dual operating modes of the Zipster. The dual operating modes allowed the Zipster to perform services for customers, as well as to assist service personnel in their calibration of the various Zipster components. The dual modes functionality appears in the Zipster SOW. Mr. Daron testified to the mechanics underlying the dual modes technology, stating that the Zipster's main application software contained approximately 300,000 lines of code and that the code ran all of the machine control functions; these functions were identical in each Zipster, regardless of

the locale of its installation. The Zipster maintenance system, however, contained information individualized for each Zipster, and the system was segregated from the main software application. A central facility could call and update each Zipster through a telephone line, thereby avoiding the need for a repair person from having to visit the Zipster on-site. According to Mr. Daron, this entire technological design was proprietary.

This function appeared in other earlier Statements of Work in a slightly different form, as such dual modes are vital for any machine that weighs and rates. On cross-examination Mr. McAlexander acknowledged that the PMC–II SOW includes dual operating modes—a rate classifier mode and a calibration or test mode. Moreover, Mr. Wilson indicated, and Mr. McAlexander conceded, that the dual mode language appears almost verbatim in the Weighing and Rating Unit Statement of Work ("WRU SOW"), which was in existence at least one year before USPS personnel knew of the Zipster. Further, the Weight Sensing System ("WSS") specification, dated April 20, 1990, indicates that such a dual mode is needed.

Mr. Daron provided his insight into the proprietary features of the Zipster and how the Zipster SOW related to the Zipster's dual operation mode technology. For example, Mr. Daron indicated that the self-diagnostic features of the Zipster were confidential, novel, and commercially important. Ten times every second, the Zipster would test to confirm that its peripherals were attached and working. This self-diagnostic ability also permitted customers to engage in certain transactions, even when a mechanical problem prevented other transactions from being completed. If, for example, a Zipster were out of receipt paper, the machine would notify a customer of this situation, and ask whether the customer wished to proceed without being able to receive a receipt.

Sponsored by Mr. Dajani as predating the Zipster, the Quickpost SOW also contained a self-test function, such that any error generated would be logged in the Information Storage System of the machine. The Quickpost would then be able to dial into a host computer and notify the USPS of the problem. Although possibly not as elaborate as plaintiff's self-test feature, the Quickpost SOW contained this capability. However, as discussed below, defendant cannot establish pre-existence of this feature through Mr. Dajani due to the witness's lack of credibility.

Mr. Daron also testified to the ability of the Zipster to maintain an uninterrupted power supply that, in the event of an outage, would allow for the completion of an ongoing transaction and for the continued operation of every function for 30 minutes. Mr. Daron labeled this ability as a confidential aspect of the Zipster. Additionally, Mr. Daron stated that the Zipster rebooted, after restoration of power, into the main application, and not into the start-up screen of its operating system. This ability allowed the Zipster to resume normal function after a power outage without the intervention of maintenance personnel.

The court notes that innumerable everyday devices, from simple alarm clocks to emergency lighting, contain emergency power supplies that allow continued operation in the event of power loss. This advent in technology was known to the USPS, and the general public, well before the Statement of Work distributed during the June 18, 1993 industry meeting was created. The rebooting of the Zipster into the main application after power failure is a matter of general application.

Further, Mr. Daron testified that the Zipster's ability to print a receipt identifying the location and time of the transaction, the charges incurred during the transaction, and the amount of money still contained on the debit card used during the transaction was proprietary information. Although such information is certainly a convenience, plaintiff did not establish that such information is proprietary. Almost any receipt based upon a debit card transaction contains, and has contained for many years in the past, this information. If such technology were proprietary to plaintiff, the court is surprised that plaintiff has not sought to enforce its claims against all debit card companies. No other witness, including Mr. McAlexander, plaintiff's expert on trade secret protection, testified about this capability.

Mr. Wilson testified that the PMC, which predates the Zipster, was capable of table updating through host computer communications. The universal stamp vending machine also possessed a similar functionality.

Although plaintiff's lines of code for performing the functions of the dual operating modes is most certainly proprietary, plaintiff has not asserted, nor has it been demonstrated, that the USPS disclosed or co-opted the actual code used to perform the functions of the dual operating modes. Rather, ample evidence demonstrates that the dual operating modes represented a concept and an operation that the USPS knew of and utilized in the WRU SOW and WSS specification prior to its contracting with plaintiff. No liability is present under paragraph 9 of the contract for disclosure of the dual operating modes.

Fourth, Mr. McAlexander testified about the ability of the Zipster to indicate that it was 100% full and to inhibit further customer transactions. Mr. Daron also testified to this feature of the Zipster. He stated that this feature was not visible from the Zipster's exterior and that he considered it confidential information. Mr. McAlexander laid claim to this feature as proprietary.

Mr. Dajani provided defendant's only evidence that having sensors in machines was fairly common, that these sensors could be set for different functions, and that the Quickpost SOW, for example, contained a sensor that indicated to a host computer that the coin bin was full and needed to be emptied. For reasons discussed below, the court cannot credit this testimony.

Fifth, Mr. McAlexander discussed the Zipster's ability to print and paste both postage and mailing labels with their associated bar codes. He indicated that this functionality was an expansion of known technologies. However, on cross-examination Mr. McAlexander testified that this "expansion" was simply the Zipster's production of a peel-off label; the PMC–II SOW, on the other hand, called for printed labels to be applied by pressure. Implausibly, Mr. McAlexander identified this distinction as significant.

The evidence cannot support a finding of a "significant" difference between the Zipster SOW and the PMC–II SOW insofar as they both print postage and mailing labels. The differences in actual application of the labels are superficial. The USPS possessed the requisite knowledge about the printing and pasting of postage and mailing labels to prevent this concept from being covered under paragraph 9 of the market test contract.

Sixth, Mr. McAlexander testified to the Zipster's capability to provide automatic nine-digit zip code determination based on the recipient's mailing address. After determining the proper zip code, the Zipster could a print bar code representation of the zip code directly onto mail. Plaintiff asserts that this function was its proprietary and confidential information.

Since the advent of the nine-digit zip code in or around 1985, USPS sorting machines have had the capability to print bar codes onto envelopes. Mr. Wilson testified that such bar codes are now so common that many word processing programs, such as Microsoft Word, contain the same feature. Therefore, this capability cannot be considered proprietary.

Seventh, Mr. McAlexander made the bold claim that the weight of the Zipster, listed as 900 pounds in the Zipster SOW, was proprietary. Mr. Wilson, however, pointed out that the Statement of Work distributed at the industry meeting indicated that weight was "not to exceed" 900 pounds. Therefore, the 900 pound designation was not a required weight; rather, it was merely an upper limit.

That the maximum weight of an item would be proprietary or confidential is incredible. The maximum weight of 900 pounds reveals next to nothing about the Zipster. It does not reveal the inner workings or the functions of the Zipster. It indicates merely that the machine described in the Statement of Work distributed during the June 18,1993 meeting must be less than 900 pounds. No one at the industry meeting learned anything about how much the Zipster actually weighed. In fact, no one who received the June 1993 Statement of Work would be able to identify anything proprietary about the Zipster from the Statement of

Work's maximum weight designation. This lack of revealed information cannot stand as a violation of paragraph 9 of the contract.

Eighth, Mr. McAlexander testified that the shipping dimensions of the Zipster, recorded in the Zipster SOW, constitute proprietary technology. Mr. Daron claimed that the Zipster's size was the result of plaintiff's research and development, although he also conceded that the machine's height matched the standard door height for commercial establishments and that its size matched the rear door dimensions of electronic data machine transports, *i.e.*, trucks that carry devices like automated teller machines. Moreover, Mr. Wilson testified that the Zipster's dimensions were the largest the USPS could tolerate and that future machines could be no larger than the Zipster.

That the maximum shipping dimensions of an item would be claimed as proprietary or confidential further diminishes plaintiff's trade secret protection expert's credibility. The dimensions reveal next to nothing about the Zipster. They do not reveal the inner workings or the functions of the Zipster. All they indicate is that the machine described in the SOW distributed during the June 18, 1993 meeting must be less than maximum tolerances set by the USPS. No one at the industry meeting learned anything about the actual size of the Zipster. This type of information is not a violation of paragraph 9 of the contract.

Mr. McAlexander also seemed to indicate on cross-examination that information regarding scale capacity in subsequent Statements of Work was taken verbatim from the Zipster SOW. While Mr. Gil, plaintiff's president, denied that the Zipster's scale capacity was one of the pieces of technology that plaintiff claimed was proprietary, Mr. McAlexander asserted that the 70–pound scale limit on the Zipster was confidential information. However, Mr. McAlexander later conceded that 70 pounds is the maximum shipping weight permitted by the USPS in its *Domestic Mail Manual.* While Mr. Wilson testified that it was logical that any automated postage and mailing machine would be limited to the maximum weight allowed by the USPS, he was not willing to accept this

logic because some Statements of Work had maximum capacities of less than 70 pounds.

Another piece of scale information that Mr. McAlexander asserted was proprietary was the display of weight in pounds and ounces. Yet, WSS specifications dated April 20, 1990, and September 21, 1990, required a display in pounds and ounces and contained verbatim scale information. Mr. McAlexander conceded this similarity.

The scale information contained in the Statement of Work distributed at the June 18, 1993 is not proprietary within the coverage of paragraph 9 of the contract. It was established at trial that the scale information is standard, and has been used widely by the USPS for a number of projects that predate the market test contract.

Ninth, Mr. McAlexander appeared to contend that even if the USPS independently had developed bits and pieces of the Zipster technology and had incorporated them in different machines and different Statements of Work that predate the market test contract, the collection of all of the functionalities and components into one machine and one Statement of Work makes the Zipster valuable and proprietary. His thesis was that the sum is greater than the parts. He testified that "[n]o other equipment had [the Zipster's] features in combination."

Mr. Dajani's testimony in the 1999 trial was crucial to rebut plaintiff's contention that the USPS had not developed Statements of Work with features comparable to the Zipster prior to the market test contract. He was defendant's lone witness at the September 1999 trial to establish that the USPS had in development, as of December 1990, every element of the Zipster proprietary technology.

Mr. Dajani dispatched with the contention that the technology was scattered between machines, *i.e.*, that it did not appear in one machine before the Zipster. In response to the question of whether the Zipster, with its "host computer connections, . . . package capture, . . . touch screen[,] and interactive conversational recorded messages for the customer" was more technologically advanced than other automated postage and

mailing machines of 1985 to 1991, Mr. Dajani answered: "Short of the package capturing that you just mentioned, everything was in [an automated mailing machine called] Autopost in 1987." Moreover, the USPS integrated the package capture feature into the PMC–II SOW, which, as discussed in I.4, *infra*, predated the USPS contract with plaintiff. Thus, according to Mr. Dajani, the Zipster's particular combination of features was known by the USPS before the Statement of Work was distributed at the June 18, 1993 meeting, and, as such, could not be claimed as proprietary.

### 4. *Supplemental evidence*

The September 2000 evidentiary hearing was confined to the forensic issues in connection with the authenticity of the Quickpost SOW and to testimony from Mr. Dajani and other USPS employees concerning the development of that Statement of Work. In testifying as to why he did not mention the Quickpost SOW and PMC II–SOW documents during his 1997 deposition, Mr. Dajani was unconvincing. He explained that he confined his answers to machines that had been designed or developed, not to concept documents. However, the deposition questions should have elicited the witness' familiarity with the Quickpost and PMC–II documents. *See* Order entered on Dec. 16, 1999. He had no acceptable explanation for defense counsel's June 18, 1999 written representation to plaintiff's counsel, prior to his revelatory epiphany at trial, that Mr. Dajani had "limited recollection" of the Quickpost. Nor could he explain how the copy of the Quickpost SOW, which he testified was in his desk, disappeared during a subsequent move and could not be produced for forensic examination.

Arthur L. Wilson, a senior programmer in 1994 with the USPS, who was in charge of converting the USPS's computer system from Wang to Microsoft Word, testified that the "created date" on a document was maintained from the Wang properties when a document was converted. Wang assigned a date without operator input. He established that the creation date for the PMC–II SOW was December 26, 1990. Two other defense witnesses established that the document could not have been altered after it was converted in June 1994.

Katherine Mainolfi Koppenhaver, plaintiff's expert in forensic document examination, examined six versions of the title page of the Quickpost SOW. She opined that the date field of December 17, 1990, had been stretched, *i.e.*, the date had not been entered at the time the document text originally was created. Defendant's expert, Elizabeth L. James, a forensic document examiner with the Federal Bureau of Investigation ("FBI"), whose accreditation was more impressive than Ms. Koppenhaver's, testified that she could not ascertain that the date had been altered. Lee Shepps, a computer forensic evidence examiner for the FBI, testified this time for defendant as an expert in forensic examination of computerized evidence. He conceded that, although it would be "extremely difficult" to alter the Quickpost SOW, it is impossible to pinpoint conclusively the last date the SOW was modified before it was converted to Microsoft Word on June 16, 1994. Ultimately, the parties agreed on three stipulations related to the potential modification and alteration of the electronic data: 1) the computer files could not have been changed once they were backed up on Microsoft Word or Wang; 2) after June 19, 1994, there was no alteration in backed up documents or documents printed from back up tapes; and 3) the date on the documents printed out from the restored tape reads December 17, 1990.

John L. Hughes–Caley, who at the relevant time worked as a retail marketing specialist in the USPS Office of Retail, Engineering Development Center, was one of the few neutral witnesses. He was involved with the Quickpost machine circa 1989. He identified the Quickpost SOW dated December 17, 1990, as the "most final version" of the Quickpost SOW that he reviewed. However, he conceded that the effort to develop Quickpost continued throughout March 1991, and that he did not participate in active system design after December 17, 1990.

Marybeth Richter, vending program manger for the USPS in the late 1980s and early 1990s, considered the Quickpost SOW, which she viewed in the 1990–91 time frame, to be

duplicative of the PMC. She recalled that, owing to the perception that the Quickpost was a "duplicate effort of the PMC," work on the Quickpost stopped as of January 28, 1991. Ms. Richter did not know, however, whether the USPS's engineering department continued to develop technology mentioned in the Quickpost SOW subsequent to the project's termination.

David F. Higgins, a contract technical writer for the USPS from 1985 until 1992, testified that he worked on the Quickpost SOW as a technical writer beginning in 1990. He specifically identified a June 13, 1990 version of the Quickpost SOW. It appears that Mr. Dajani claimed what actually was Mr. Higgins' authorship.

The court is left with the firm conviction that Mr. Dajani's discredited testimony has not been sufficiently corroborated by other defense witnesses. While defendant has demonstrated that the Quickpost SOW had evolved when the Zipster arrived in Merrifield in August 1991, defendant has not established that the Quickpost SOW, introduced during the 1999 trial as DX 193, contained the features which plaintiff claims as proprietary to the Zipster. A finding that DX 193 was created after December 19, 1990, is not required, and the court does not make it, in any event, because the limitations of the forensic examinations were disclosed handily in each expert's respective cross-examination.

The court cannot accept DX 193 as proffered by Mr. Dajani, nor Mr. Dajani's testimony on point. The court has two alternatives: to decide the case on the extant theories, or to treat defendant's evidentiary lapse as the predicate for reopening the proceedings to allow plaintiff's takings theory. Both plaintiff's penultimate counsel and defendant's second counsel, who conducted the 2000 evidentiary proceeding, argued at that time for reopening the proofs. *See supra* note 3. After much misgiving about continuing the proceedings on liability, the court must concur. The record does not admit of adequate evidence on the state of the USPS development of Statements of Work for Zipster analogues to render findings. The findings on plaintiff's

proprietary information are therefore tentative and offered only for the parties' guidance.

The court cautions that plaintiff's expert testimony at the 1999 trial was not forceful, that defendant will likely engage its own expert as the case proceeds, and that defendant will be able to introduce other evidence to support its position that the USPS had in hand as of August 1991 all the proprietary features that plaintiff claims for the Zipster. Thus, plaintiff should regard its achievements in this opinion as a beachhead that could be retaken by defendant. Correspondingly, defendant will not benefit from attempting to prove the percipient factual elements of its case in 2003. Its witnesses during the 2000 proceedings conceded as much.

## II. *Defendant's counterclaims*

■ Defendant alleges that it advanced $17,500.00 for television advertising that plaintiff never actually purchased. It seeks repayment of the advance because plaintiff failed to meet its contractual obligation to use the advance for the stated purpose.

Modification M06 to the market test contract allocated $17,500.00 for television advertising. To prove breach of this modification, defendant must demonstrate that the USPS advanced the monies to plaintiff, that plaintiff was required under the contract to use them for a given purpose, and that plaintiff failed to use them for such contractual purpose. If defendant were to meet this burden, plaintiff's liability follows for damages related to the breach of Modification M06.

No dispute exists as to the validity of Modification M06, as to whether the USPS advanced the money, or as to whether the modification required plaintiff to spend the money on a media campaign. The only issue in dispute is whether plaintiff spent the advance on the agreed-to media buy. Plaintiff's contention that it paid a sum of $17,500.00 for television advertising is not credible. After months of discovery, plaintiff failed to produce any record of payment, any canceled check, or any invoice from any me-

dia outlet. Mr. Gil was asked about documentation, and he indicated an inability to provide such.

Moreover, Postal Inspector Daniel J. Ryan testified to the auditors' inability to locate documentation for the advertising expense. The postal inspection audit reviewed plaintiff's corporate records for financial documents for months before and after the asserted media buy, but to no avail. No records were found. The court accepts the testimony of Mr. Ryan and observes that every trial benefits from a witness like Mr. Ryan—a witness who evidences a commitment to his line of work and confidence in how he discharges his duties.[10]

The record supports a finding that plaintiff failed to use the $17,500.00 advance for the television advertisement campaign. Because the contract required plaintiff to spend the $17,500.00 advance on television advertising and because plaintiff did not so spend the advance, plaintiff is liable to the USPS for damages relating to the advance of advertising fees.

■ Defendant further counterclaims for royalties that it alleges plaintiff never paid. Under the contract plaintiff was to pay the USPS $425,000.00 in royalty fees for the use of USPS logos. Modification M08 to the market test contract required plaintiff to pay the royalty fees in full or to relinquish possession and ownership of the 30 Zipsters used during the market test. Plaintiff neither paid the royalty fees nor transferred the Zipsters; consequently, plaintiff is liable for breach of contract.

Plaintiff presses its wrongful termination as a defense to its obligation to pay the USPS monies advanced pursuant to the Zipster test market contract. Plaintiff at no time denied owing the USPS such royalty fees. Instead, it defends on the grounds that because the USPS wrongfully terminated the contract, it is not liable for the royalty fees. Because the court has determined that termination was not wrongful, plaintiff's predicate for non-liability is absent. Therefore, plaintiff is liable to the USPS for any royalty fees not yet paid under the terms of the Zipster market test contract.[11]

Plaintiff's liability for this amount is limited by certain monies expended by plaintiff in preparing for an advertising campaign that was subverted by Mr. Wetherington. As stated above, paragraph 8 of the contract provided for an advertising plan. The plan envisioned the production of a quantity of promotional materials large enough to cover the designated media area. Mr. Gil testified that a predicate of the parties' agreement to test market the Zipster involved the USPS mailing the brochures designed by plaintiff; in fact, Mr. Wetherington promised that the USPS would mail one million pieces of promotional mail under the G–10 permit, an indicia of free postage. However, after plaintiff produced approximately 500,000 mailers, it was able to mail only 15,000 of them under the G–10 permit before its rights to use the permit were revoked.

Because plaintiff prepared mailers which were never delivered, plaintiff's total liability shall be reduced by the amount expended in preparing the 485,000 undelivered mailers.

Finally, defendant counterclaims for unpaid pick-up fees. Paragraph 11(c) of the USPS contract with plaintiff required plaintiff to pay a daily pick-up fee of $4.50 for each Zipster used in the market test. To fulfill this obligation, plaintiff opened "trust accounts" to allow participating post offices to withdraw the fees as they came due to the USPS. However, according to Mr. Hintenach,

---

10. During the 1999 trial, plaintiff requested to recall Mr. Gil after the testimony of Mr. Ryan. Mr. Gil was excluded from testifying in rebuttal because, in violation of Fed.R.Evid. 615, he conversed with another witness, Ms. Shaw, about testimony of at least one other witness while trial was proceeding.

11. Even if the court were to accept plaintiff's alternate argument that the USPS frustrated the purpose of the contract by failing to provide the promised advertising, discussed *supra* at I.2,

such a finding would not vitiate the reporting requirement of the contract. The frustration argument would only bear on plaintiff's reciprocal obligations concerning pick-up fees and royalties. If the USPS were frustrating the contract, plaintiff still was required to document its performance to the USPS in the form of its weekly and monthly reports. This plaintiff failed to do, and for this reason alone, the USPS was justified in terminating the contract.

the trust accounts were underfunded as of December 1992, and a December 29, 1992 letter to Mr. Gil indicates that Mr. Wetherington refused to authorize a postponement of the overdue pick-up fees. Moreover, Mr. Letts's facsimile to plaintiff, sent January 14, 1993, accuses plaintiff of "stringing [the USPS] along about payment of USPS pick-up fees," and clearly shows that plaintiff was not keeping sufficient funds in the trust account to satisfy its pick-up fee obligations.

Paragraph 3 of Modification M07 to the market test contract, issued on November 9, 1992 and executed by both parties, states that plaintiff "shall immediately pay all postal account balances due, and shall make deposits in postal accounts as required by postal regulations." Mr. Letts testified that this language referred to the overdue pick-up fees. Paragraph 5 of M07 warns that failure to comply with paragraph 3 of Modification M07 "may be cause for termination of the contract by the USPS."

While plaintiff admits that it did not pay the pick-up fees on time, Mr. Coleman testified that he provided plaintiff with a check in March 1993 to enable it to pay the overdue fees. He further stated that the USPS verbally acknowledged receipt of the payment to plaintiff. Given the overall credibility of Mr. Coleman, and the fact that the USPS did not dispute on cross-examination that Mr. Coleman paid the overdue pick-up fees after the termination of the contract, the court concludes that plaintiff paid the pick-up fees. Therefore, plaintiff is not liable to the USPS for the pick-up fees.

## CONCLUSION

Based on the foregoing, plaintiff has failed to establish liability for wrongful termination. It has demonstrated sufficient proof to establish USPS liability for the expenses incurred in the production of mailers heralding the arrival of the Zipster.

Defendant has failed to establish liability for the pick-up fees owed under the market test contract, although the contract properly was terminated, *inter alia*, for failure timely to pay these fees. It has proved that plaintiff failed to spend the television advertising advance in accordance with the terms of the contract and that plaintiff has failed to pay the royalty fee or to relinquish the Zipsters as called for in the contract and subsequent modifications. Accordingly,

**IT IS ORDERED,** as follows:

1. Defendant has prevailed on plaintiff's claim for wrongful termination.

2. The findings herein, relevant to plaintiff's claim of breach of paragraph 9 of the contract are subject to revision or supersession based on evidence developed in a future trial on plaintiff's taking claim. *See* RCFC 54(b).

3. Defendant has prevailed on its counterclaim for liability relating to the advertisement advance and the royalty fee, less a refund due plaintiff for prior expenses incurred for the mass mailing. Defendant has failed to establish liability for the pick-up fees.

4. By October 15, 2002, the parties shall file a stipulation of the net amount due to the USPS on its counterclaim.

5. By October 15, 2002, plaintiff may file an amended complaint to plead a taking. Defendant shall file an answer by October 30, 2002.

6. The parties shall file a discovery plan by November 15, 2002

7. All discovery shall be completed by March 30, 2003.

8. Trial on liability for a taking and damages, not to exceed 10 days, shall commence at 10:00 a.m. on Monday, April 14, 2003, in Houston, Texas, at a location to be announced by further order.