**PI ELECTRONICS CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–664C.**

United States Court of Federal Claims.

Feb. 20, 2003.

Lonnie L. Simpson, Tampa, FL, for plaintiff. Robert J. Cynkar, Hamish P.M. Hume, Victor J. Wolski, and Elisebeth B. Collins, Cooper & Kirk, of counsel.

Patricia M. McCarthy, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Michael J. Vandamm, United States Postal Service, of counsel.

## OPINION

MILLER, Judge.

Six years after filing a complaint for breach of contract and two years after trial on liability, plaintiff was allowed to amend its complaint to plead a taking of its trade secret. After plaintiff filed its takings claim in November 2002, defendant challenged it as facially deficient under RCFC 12(b)(6) because, *inter alia,* plaintiff cannot establish as an element of its claim that the United States authorized a taking. Argument is deemed unnecessary.

## FACTS

An extensive factual background and procedural history precedes this dispositive motion. *See Pi Elecs. Corp. v. United States,* 54 Fed.Cl. 56, 58–62 (2002). Consequently, only the facts relevant to plaintiff's takings claim are recited, and only the prior judicial proceedings that impact the resolution of defendant's motion will be discussed. The court reiterates only facts pled in plaintiff's Third Amended Complaint filed November 8, 2002, and findings made in the court's September

10, 2002 opinion on liability. *See generally, Pi Elecs.*, 54 Fed.Cl. 56.

### 1. *Background*

In 1983 Pi Electronics Corporation ("plaintiff") began developing a line of free-standing, automated mail processing machines, collectively deemed "the Zipster," which was designed to assist employees of the United States Postal Service (the "USPS") in completing various tasks and to allow customers to perform certain postage and mail delivery functions without assistance. Third Am. Compl. filed Nov. 8, 2002, ¶¶ 15–16. Plaintiff submitted a proposal discussing the functional capabilities of the Zipster machines to the USPS on July 23, 1985. *Id.* ¶¶ 18–19. The proposal's cover was labeled "Confidential" and contained a warning that the submitted data could not be used for any purpose other than to evaluate the proposal.[1] *Id.* ¶ 18. Plaintiff met with USPS representatives a short time later and submitted photographs of the Zipster II, a self-service machine designed for post office lobbies, as well as photographs and artist renderings of other machines in the Zipster line. *Id.* ¶ 21. On November 8, 1985, Eugene A. Keller, General Manager of the Procurement Policies and Programs Division, USPS Procurement and Supply Department, notified plaintiff in writing that, after reviewing plaintiff's proposal, the USPS had determined that the Zipster machines did not offer sufficient benefit to the USPS to warrant further investigation. *Id.* ¶¶ 20, 23. Plaintiff contacted the USPS repeatedly in late 1985 and early 1986 to request the return of its proposal, photographs, and artist renderings, but was informed that the materials could not be located. *Id.* ¶ 24.

Plaintiff then spent the next four years at its Houston, Texas headquarters revamping the Zipster II in an effort to develop a machine which could provide "postal customers the same sort of 24 hour a day, seven days a week service at convenient locations that ATMs provided them for their banking needs." Third Am. Compl. ¶ 29. The result of these efforts was the Zipster Plus, "a self-service kiosk that would allow postal customers to weigh packages, buy postage, and mail letters and packages from locations remote from a Post Office lobby." *Id.* During plaintiff's four-year improvement effort, the USPS contracted with other vendors for two different self-service machines: the Universal Stamp Vendor (the "USV") and the Weighing and Rating Unit (the "WRU"). *Id.* ¶ 25. The USV was an electronic stamp dispenser, and the WRU could determine the cost of shipping an item based on its weight. *Id.* ¶¶ 26–27. By late 1990 the USPS amended both of these contracts to require the contractors to combine their developments into a new machine called the Postage and Mailing Center (the "PMC"). *Id.* ¶ 28; *see also Pi Elecs.*, 54 Fed.Cl. at 65.

In 1991 the Houston branch of the USPS became aware of the Zipster Plus, and, after Houston employees viewed the machine, plaintiff extended an invitation to Anthony Frank, USPS Postmaster General, in May 1991 to visit plaintiff's headquarters. Third Am. Compl. ¶¶ 33–34. USPS representatives visited plaintiff's Houston complex on June 27, 1991, and, after assuring plaintiff's president, Asher Gil, that USPS personnel were bound by federal guidelines prohibiting the disclosure of confidential information, the representatives were given a "full and detailed demonstration of the Zipster Plus, lasting an entire business day." *Id.* ¶¶ 36–37. After viewing the demonstration, James Wetherington, General Manager, Research and Engineering Division, USPS Office of Procurement, favorably compared the Zipster Plus to two other self-service machines the USPS had in development; he recommended engaging plaintiff's services in the future, as he believed the Zipster Plus would provide the USPS with long-term savings.

---

1. The court's September 10, 2002 opinion on plaintiff's wrongful termination and breach of contract claims discusses plaintiff's efforts to keep its proprietary information confidential, *Pi Elecs.*, 54 Fed.Cl. at 58–59, and the Third Amended Complaint lists specific actions that plaintiff took to guard its confidential material,

Third Am. Compl. ¶ 72. In the interest of keeping this factual exposition to a minimum, the court has found that plaintiff made extensive efforts in its interactions with the USPS to protect information that it considered proprietary and confidential.

*Id.* ¶¶ 41–42; *Pi Elecs.*, 54 Fed.Cl. at 58. Bogdan Jonic, Program Manager, USPS Retail Equipment Division, echoed Mr. Wetherington's assessment and predicted that the Zipster Plus could save the USPS $1 million and years in technology development. *Id.* ¶ 44; *Pi Elecs.*, 54 Fed.Cl. at 58.

Based on its representatives' reports, the USPS expressed a desire to operate market tests of the Zipster Plus. Third Am. Compl. ¶ 46. Before a market test contract was executed, the USPS advised plaintiff in August 1991 that USPS contracting requirements necessitated the creation of a Statement of Work ("SOW") for the Zipster Plus. *Id.* After receiving assurances of confidentiality, plaintiff submitted to the USPS on August 2, 1991, drawings of, and specifications for, the Zipster Plus. *Id.* ¶ 49. Plaintiff later submitted additional information regarding the Zipster Plus, including an operational prototype, to the USPS's Merrifield, Virginia facility in mid-August 1991. *Id.* ¶ 50. Despite assurances that the prototype would be kept in isolation and accessed only by personnel involved in evaluating the capabilities of the Zipster Plus, the prototype was housed in "the middle of a large room at Merrifield" where it was accessible to USPS employees, consultants, and outside contractors, some of whom allegedly "improperly manipulated" the machine. *Id.* ¶¶ 51–52. On October 18, 1991, the USPS completed the final version of the Zipster Plus SOW. *Id.* ¶ 53.

On October 24, 1991, plaintiff and the USPS entered into a contract to perform a market test of the Zipster Plus.[2] *Pi Elecs.*, 54 Fed.Cl. at 59. Plaintiff's performance of the contract was deficient in a number of ways, resulting in contract termination on January 15, 1993. *Id.* at 60. By the end of January 1993, all Zipster Plus models employed under the contract were removed from the field. *Id.* at 60–61.

During performance of the contract, plaintiff alleges that the USPS sought and disclosed to its contractors certain confidential information about the Zipster Plus and that it used the Zipster Plus as a benchmark when evaluating rival self-service postal machines. Third Am. Compl. ¶¶ 57–60. For example, the USPS in October 1991 disclosed the Zipster Plus SOW to Automated Shipping, one of plaintiff's competitors, and represented that the information contained in the SOW was the USPS's "new standard for the development of a self-service, postal mailing machine." *Id.* ¶ 57. In June 1992 the USPS directed Unisys Corporation, a rival design company and a contractor on the PMC project, "to integrate Zipster Plus features such as the secure parcel drop box, bar code and label printer, uninterrupted power supply and audible Spanish instructions" into the PMC. *Id.* ¶ 59.

After the termination of the market test contract, plaintiff contends that the USPS continued to reveal proprietary features of the Zipster Plus. Third Am. Compl. ¶¶ 61–65, 68–69. At a June 19, 1993 industry meeting convened by the USPS and attended by several of plaintiff's competitors, the USPS circulated an altered form of the Zipster Plus SOW to gauge interest in an automated postage and mailing machine program. *Id.* ¶ 61; *Pi Elecs.*, 54 Fed.Cl. at 61. In October 1996 the USPS solicited proposals for a self-service mailing machine called the Postal Transaction Machine (the "PTM"), the SOW for which allegedly contained attributes revealed in the Zipster Plus SOW. Third Am. Compl. ¶ 63. When the USPS cancelled its solicitation for the PTM in September 1997, the USPS amended two existing contracts to develop a similar self-service postal machine, dubbed the Customer Service Terminal (the "CST"). *Id.* ¶ 65. Plaintiff alleges that the CST SOW includes Zipster Plus features revealed to the USPS under a promise of confidentiality; a modification to the CST contract in early 1999 lists features not included in the Zipster Plus SOW, but that "were observed by the USPS employees and consultants who studied [plaintiff's] machine." *Id.* ¶¶ 65, 68. Finally, plaintiff contends that an integral part of the USPS's Postal Transformation Plan, proposed to Congress in April 2002, was the employment of self-ser-

---

2. Paragraph 9 of the market test contract contained a confidentiality clause which is reprinted in full at *Pi Elecs.*, 54 Fed.Cl. at 64.

vice, free-standing postal machines which contain features of the Zipster Plus. *Id.* ¶ 75(e). The USPS claimed in the plan that these machines would be able to perform 80% of the tasks currently performed by USPS personnel, thereby lowering the USPS's operating costs. *Id.*

### 2. *Procedural history*

Plaintiff filed its complaint on October 21, 1996, pleading breach of contract and improper disclosure of confidential information. It amended its complaint on March 31, 1998, to include allegations of loss of trade secret value, profits, and competitive advantage. Neither of these complaints included a takings claim.

Motions for discovery extensions, predicated on matters not related to plaintiff's putative takings claim, followed, and the court ruled on defendant's motion for summary judgment on June 30, 1999. In its order partially granting summary judgment, the court clarified that only two claims presented in the amended complaint could be pursued in the Court of Federal Claims: wrongful termination and breach of contract, whether based on an implied contract for nondisclosure of proprietary information or on the nondisclosure provision in the market test contract. Order entered June 30, 1999, at 2. Nevertheless on September 13, 1999, a week before the commencement of trial, plaintiff filed a supplemental memorandum alleging a taking of plaintiff's property. Pl.'s Br. filed Sept. 13, 1999. Plaintiff claimed that its existing pleadings reflected a takings claim, but it requested leave to modify the amended complaint "for purposes of clarification." *Id.* at 3. Defendant objected, and the court denied plaintiff leave to amend, pointing out that the "attempt to include a theory based on the Takings Clause of the Fifth Amendment comes too late . . . . It was not pleaded, nor included in plaintiff's interrogatory responses." Order entered Sept. 15, 1999, at 2.

Trial commenced on September 20, 1999, on plaintiff's wrongful termination and breach of contract claims.[3] During trial plaintiff attempted to interject a takings claim, and the court admitted evidence that could support such a claim if plaintiff justified proceeding on that ground. *See* Transcript of Proceedings, *Pi Elecs. Corp. v. United States,* No. 96–664C, at 1541–42 (Fed. Cl. Sept. 24, 1999). After the close of proofs on September 24, 1999, plaintiff filed on October 22, 1999, an amended motion *in limine* seeking, *inter alia,* to present additional evidence on its takings claim based on new documents supplied by the USPS.

The court, by order entered November 5, 1999, foreclosed plaintiff's pursuit of a takings claim. The court noted that plaintiff's original impetus for a takings claim coincided with a change in counsel and that the "new" documents that supported the newly sponsored claim had been made available to plaintiff in April 1999, five months before trial. Plaintiff was also on notice, as of June 18, 1993, the date of the industry meeting, that the USPS was using plaintiff's putatively proprietary information for an ostensibly public purpose. Most importantly, plaintiff, in contravention of the court's directive during trial, made no effort to identify specific documents that could undergird its takings argument. Order entered Nov. 5, 1999, at 2–3.

On November 29, 1999, plaintiff moved for reconsideration of the November 5, 1999 order, based on the potentially perjurious testimony of Omar L. Dajani, a defense witness and USPS employee, and the authenticity of an SOW prepared by Mr. Dajani that had been introduced at trial to support the USPS's claim that it had working knowledge of features plaintiff claimed were proprietary to the Zipster Plus. The court granted plaintiff's motion by order entered on March 14, 2000, and, after an interregnum for more discovery, held a supplemental evidentiary hearing on September 25–27, 2000, solely with respect to the allegations presented in plaintiff's motion for reconsideration.

At the close of trial, the court stayed the proceedings pending the parties' resolution

---

3. The court also tried plaintiff's other contract-based claims, including frustration of purpose, hindrance of performance, and breach of the duty of good faith and fair dealing. *Pi Elecs.,* 54 Fed.Cl. at 63.

of their claims through alternative dispute resolution ("ADR"). When a 17–month ADR effort proved fruitless, the court issued an opinion on September 10, 2002, which addressed the issues raised in both the 1999 liability trial and the 2000 evidentiary hearing. The court found that the USPS did not wrongfully terminate the contract and that defendant had prevailed on its counterclaims for an advertising advance and a contractually-mandated royalty fee. *Pi Elecs.*, 54 Fed. Cl. at 62–63, 73. However, the measure of defendant's recovery would be reduced by the amount plaintiff spent on preparing mailers for a cancelled advertising campaign. *Id.* at 72.

The court also made various findings regarding plaintiff's breach of contract claim. It noted specifically that the USPS relied on Mr. Dajani's testimony, and the SOW sponsored by him, to establish the USPS's knowledge before 1991 of certain aspects of the Zipster Plus that plaintiff claimed were proprietary and protected by the contract's confidentiality clause. *Pi Elecs.*, 54 Fed.Cl. at 68–71. The court could not credit Mr. Dajani's testimony, and the evidence concerning the authenticity of the SOW at issue was inclusive. *Id.* at 71. Based on both plaintiff's and defense counsel's preference, stated at the end of the 2000 evidentiary hearing, to retry the issues relating to whether plaintiff's Zipster machines predated the USPS's development of an SOW with the same features, the court allowed plaintiff to proceed with its takings theory. *Pi Elecs.*, 54 Fed.Cl. at 71.

Plaintiff filed its Second Amended Complaint, as corrected, on October 21, 2002. Defendant moved for a more definite statement on October 29, 2002, arguing that this iteration of the complaint included a takings claim pled without the requisite specificity, as well as several causes of action disposed of in the court's September 2002 opinion. The court addressed defendant's motion and various discovery issues in a status conference held on October 30, 2002, during which plaintiff attempted to justify an incompetent takings claim and moot allegations as preserving its right to appeal. *See* Order entered Oct. 31, 2002, at 1. The court responded that the findings and conclusions in the September

10, 2002 order preserved plaintiff's right to appeal and that they bind plaintiff only to the extent ordered. *Id.* at 1, 2. The court afforded plaintiff a final opportunity to amend its complaint to plead only takings allegations; the court cautioned that should "the Third Amended Complaint prove defective, plaintiff will be remitted to damages under the contract." *Id.* at 1.

Plaintiff filed the Third Amended Complaint on November 8, 2002, alleging that the USPS effected a compensable taking by disclosing to plaintiff's competitors plaintiff's trade secret, *i.e.*, "the Zipster Plus, a self-contained, fully-integrated and fully-automated postal service and mailing machine capable of secure, reliable operation at remote locations." Third. Am. Compl. ¶ 70. Plaintiff also claims that it suffered a taking when the USPS used the trade secret "to evaluate and direct improvements in competitors' proposals, and develop the USPS's plan to market and deploy self-service machines." *Id.* ¶ 76(b). Defendant moved to dismiss the Third Amended Complaint for failure to state a claim, arguing that: 1) plaintiff is restricted to its remedies under the market test contract, and 2) the Third Amended Complaint fails to plead the requisite components of a compensable taking. Specifically, defendant contends that the Third Amended Complaint does not state a takings claim because it fails to allege, and cannot support any allegation, that the USPS appropriated the Zipster Plus for a public use or that the actions that gave rise to the alleged taking were authorized.

## DISCUSSION

1. *Standard for dismissal for failure to state a claim under RCFC 12(b)(6)*

Defendant argues that the allegations contained in the Third Amended Complaint fail to state a claim upon which relief may be granted. *See* RCFC 12(b)(6). When a federal court reviews the sufficiency of a complaint for failure to state a claim, " 'its task is necessarily a limited one.' " *Swierkiewicz v. Sorema,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "The issue is not whether a plaintiff will ultimately prevail but whether

the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. This court adheres to "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Conti v. United States*, 291 F.3d 1334, 1338 (Fed.Cir.2002). Under RCFC 12(b)(6), the court must accept as true the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), and must construe all reasonable inferences in favor of the non-movant, *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed.Cir.2001). Therefore, this court must deny a motion under RCFC 12(b)(6) if relief can be granted "'under any set of facts that could be proved consistent with the allegations.'" *NOW, Inc. v. Scheidler*, 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

2. *Exclusivity of contractual remedy*

█ Defendant first argues that the Third Amended Complaint must be dismissed because plaintiff has a viable breach of contract claim. Defendant contends that plaintiff's "relationship with the [USPS] is defined *exclusively* by its voluntary [market test] contract with the [USPS]," Def.'s Br. filed Dec. 23, 2002, at 11, and that the USPS has not interfered with plaintiff's right to recover damages under the contract. A litany of cases is recited, which defendant claims stand for the proposition that plaintiff is entitled to a takings remedy only if it is foreclosed from bringing a breach of contract claim, *i.e.*, if its contract rights have been "taken."

A takings claim has limited application when a claimant has a viable breach remedy. *Castle v. United States*, 301 F.3d 1328, 1342 (Fed.Cir.2002), *petition for cert. filed*, 71 U.S.L.W. 3430 (U.S. Dec. 16, 2002) (No. 02–938); *Granite Mgmt. Corp. v. United States*, 55 Fed.Cl. 164, 166, (2003). This is so be-

cause "[v]irtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." *United States v. Winstar Corp.*, 518 U.S. 839, 919, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (Scalia, J., concurring) (internal quotation marks and citation omitted).

As defendant concedes, this legal axiom applies when "'the relative rights of party litigants ... have been voluntarily created by contract. In such instances interference with such contractual rights generally gives rise to a breach claim not a taking[s] claim.'" *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed.Cir. 2001) (quoting *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978)); *Baggett Transp. Co. v. United States*, 969 F.2d 1028, 1034 (Fed.Cir.1992). Defendant's cases support this well-settled proposition. *See Castle*, 301 F.3d at 1335, 1342 (takings remedy appropriately denied for Government's breach of supervisory merger agreement); *Baggett*, 969 F.2d at 1034 (barring takings remedy for Government's alleged breach of contract); *J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969) (takings remedy unavailable when parties' rights created voluntarily by contract); *Home Sav., of Am., F.S.B. v. United States*, 51 Fed.Cl. 487, 494–96 (2002) (denying takings remedy for Government's breach of supervisory merger agreement); *Janicki Logging Co. v. United States*, 36 Fed.Cl. 338, 346 (1996) (denying takings remedy because plaintiff "remained unfettered in its ability to use the legal process defined in the contract" to remedy claim against Government).

Anticipating defendant's argument, plaintiff "alleges that it had property *before it ever entered into the contract* with the Government." Pl.'s Br. filed Dec. 13, 2002, at 11. According to plaintiff, its property right in the Zipster Plus exists independently of the market test contract, and the contract is relevant "to the takings claim *only* insofar as it demonstrates [plaintiff's] reasonable attempts to continue to guard its preexisting

trade secret." *Id.* at 12. To limit plaintiff to remedies under the market test contract "would mean that by continuing to protect its trade secret property right when contracting with the Government ... [plaintiff] somehow 'waived' the protections in the Takings Clause." *Id.*

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001–02, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the Supreme Court distinguished the creation of plaintiff's property right in its trade secret and the extent by which that right is protected. While the Court found that property receives the protection of the takings clause when it satisfies the state's definition of a trade secret, "the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others." 467 U.S. at 1002, 104 S.Ct. 2862. Because plaintiff in the case at bar is a Texas corporation, it would appear that plaintiff obtained its property interest as soon as the Zipster Plus satisfied the definition of a trade secret under Texas law.[4] Plaintiff thus has a colorable argument that the market test contract did not create the right which plaintiff alleges has been taken.

Relevant case law supports this conclusion. In *Prudential Insurance Co. v. United States*, 801 F.2d 1295, 1300 n. 13 (Fed.Cir. 1986), the Federal Circuit indicated that plaintiff, in an action against the Government for breaching a lease, possibly could recover under a takings theory. However, resort to the takings clause "was warranted by the fact that the landowner had rights in the property separate and distinct from any rights conferred by contract." *Castle v. United States*, 48 Fed.Cl. 187, 218–19 (2000), *aff'd in part, rev'd in part, and vacated and remanded in part*, 301 F.3d at 1343. The Court of Federal Claims has recognized that vindication of rights existing independently of the contract at issue cannot be restricted to contractual remedies. *See Scan–Tech Sec., L.P. v. United States*, 46 Fed.Cl. 326, 342 (2000) (refusing to preclude takings remedy because court could not discern what

rights contract created); *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 34–35 (1998) (refusing to dismiss takings claim when court could not conclude whether contract conferred rights at issue).

It is arguable that the market test contract is not the only source of plaintiff's rights in the Zipster Plus. Defendant has not justified dismissal of plaintiff's Third Amended Complaint on this theory.

### 3. *Insufficient pleading of takings claim*

Defendant presents two additional grounds for dismissing plaintiff's takings claim. First, it argues that the Third Amended Complaint fails to state a claim that the Government was acting in its sovereign capacity; consequently, plaintiff has not shown that its property was taken for a public use. Second, defendant contends that the Third Amended Complaint fails to allege colorably that the misdeeds charged to the USPS employees were authorized. Both the public use requirement and the authorization issue are integral elements of a takings claim, so the Third Amended Complaint must present sufficient allegations with respect to both requirements in order to avoid dismissal.

#### 1) *Public use*

"Taking[s] claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity." *Hughes*, 271 F.3d at 1070 (citing *Sun Oil*, 215 Ct.Cl. at 770, 572 F.2d at 818). "Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." *Id.* Thus, in order to show that it is entitled to a takings remedy, plaintiff must have alleged that the Government was exercising "its right as sovereign to acquire property from the rightful owner for the public good." *DSI Corp. v. United States*, 228 Ct.Cl. 299, 302, 655 F.2d 1072, 1074 (1981).

---

**4.** Although not relevant to the court's disposition of defendant's motion to dismiss, the Zipster Plus may satisfy Texas's statutory definition of a trade

secret. *Computer Assocs. Int'l, Inc. v. Altai. Inc.*, 918 S.W.2d 453, 455 (Tex.1996).

Focusing specifically on two cases, *Alaska Airlines v. Johnson*, 8 F.3d 791 (Fed.Cir. 1993), and *Scan–Tech*, 46 Fed.Cl. at 330, defendant faults plaintiff for not putting forth the requisite showing. *Alaska Airlines* concerned an auditing procedure used by the General Service Administration (the "GSA") when reviewing payments made to airlines for government employee travel. Pursuant to this procedure, the GSA would deduct from subsequent airline invoices any charges that it determined to be in excess of relevant travel regulations. The airlines challenged this auditing procedure on several grounds, and the Comptroller General and a district court agreed that the regulations provided no authority for the GSA to withhold funds from subsequent billings. The district court awarded post-judgment interest to the airlines on the ground, *inter alia*, that the GSA's withholding was a taking of the airline's property. In reversing the interest award, the Federal Circuit deemed the GSA's actions as taken in good faith and in the Government's proprietary capacity. 8 F.3d at 798. Because the Government must be acting in its sovereign capacity to trigger the protection of the takings clause, the district court's invocation of a takings remedy was improper.

The Court of Federal Claims in *Scan–Tech* addressed plaintiff's claims that the Federal Aviation Administration (the "FAA") had breached a contract requiring plaintiff to design a luggage scanning system and that the FAA's retention of plaintiff's prototype without payment constituted a compensable taking. With respect to the takings claim, the court recognized that, if the contract governed the right of possession to the prototype, plaintiff's takings claim "should be dismissed, for the Government[,] in negotiating with [plaintiff], acted in a proprietary capacity, not its sovereign capacity." 46 Fed.Cl. at 342. Conversely, if the contract was silent as to the right of possession of the prototype, plaintiff's takings claim should be allowed to proceed to trial. *Id.* Thus, *Alaska Airlines* and *Scan–Tech* stand for the proposition that the Government, when transacting in a commercial capacity, cannot be liable for a taking. Defendant characterizes the USPS as acting in a proprietary manner when contracting with plaintiff, arguing that the USPS, as such, cannot be charged with a taking.

Plaintiff attempts to counter this well-settled proposition in several ways. First, it points to the Supreme Court's determination in *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240–41, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), that the public use requirement is coterminous with the scope of the sovereign's police powers, leaving the legislature broad discretion in defining what constitutes a "public use." *See Ruckelshaus*, 467 U.S. at 1014, 104 S.Ct. 2862 ("This Court, however, has rejected the notion that a use is a public use only if the property taken is put to use for the general public."). Second, plaintiff ridicules the "Government's suggestion that the [USPS] was not acting as a sovereign when it attempted to develop or purchase a device for saving the [G]overnment and the general public millions of dollars ...." Pl.'s Br. filed Dec. 13, 2002, at 17. Third, it cites *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed.Cir.1983), for the proposition that the proprietary/ sovereign distinction is not controlling when determining the applicability of a takings remedy.

If plaintiff's factual argument were accepted, defendant responds that all agency action would be found to inure to the public's benefit, as "the Government is 'by the people, for the people.'" Def.'s Br. filed Dec. 23, 2002, at 14. Defendant also distinguishes the *Yuba Goldfields* holding as narrow and points to the Federal Circuit's subsequent decision in *Alaska Airlines* as reiterating the importance of the proprietary/ sovereign distinction.

The court concludes that defendant has not justified dismissal based on its public use argument. The court is cognizant of the impact of *Alaska Airlines*, and disagrees with plaintiff's incorrect assertion that the proprietary/ sovereign distinction "is a strange argument with essentially no precedent." Pl.'s Br. filed Dec. 13, 2002, at 5. However, the Federal Circuit in *Yuba Goldfields* admonished that granting summary judgment based on a determination that the Government was acting in a proprietary ca-

pacity was inappropriate because "the resolution of the 'proprietary-sovereign' dichotomy is not in itself controlling in just compensation jurisprudence." 723 F.2d at 889. Despite defendant's protestation to the contrary, *Yuba Goldfields* remains good law, and the precedential value of the case is not limited to its facts. *See Pettro v. United States,* 47 Fed.Cl. 136, 148–50 (2000) (citing *Yuba Goldfields* to support its finding that plaintiff suffered compensable taking).

Plaintiff has also raised factual allegations, especially with respect to the favorable reviews penned by USPS personnel upon viewing the Zipster Plus in 1991, regarding a possible public use for plaintiff's trade secret. These reviews predicted that the Zipster Plus could save the USPS $1 million and years of technological research. Third Am. Compl. ¶ 44. Plaintiff also alleges that the USPS distributed an altered form of the Zipster Plus SOW to rival companies at the 1993 industry meeting. *Id.* ¶ 61. Finally, the USPS included designs for a freestanding, self-service postal machine, which allegedly contained attributes of the Zipster Plus, in its transformation plan to Congress and indicated that the machine would be able to perform 80% of functions currently executed by employees. *Id.* ¶ 75(e). These contentions, viewed in the light most favorable to plaintiff, plead a sufficient claim that the alleged taking of plaintiff's trade secret redounded to the public good. Accordingly, defendant has not justified dismissal on this ground.

### 2) *Authorization*

■ Defendant's final argument hinges on plaintiff's alleged failure to present facts demonstrating that the actions that give rise to the takings claim were authorized.[5] It is well settled that a "compensable taking arises only if the government action in question is authorized." *Del–Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362 (Fed.Cir.1998); *see also Rith Energy,*

*Inc. v. United States,* 247 F.3d 1355, 1365 (Fed.Cir.2001). An unauthorized action cannot predicate liability for a compensable taking, given that it does not "vest some kind of title in the government and entitlement to just compensation in the owner or former owner." *Armijo v. United States,* 229 Ct.Cl. 34, 40, 663 F.2d 90, 95 (1981) (cited with approval in *Del–Rio,* 146 F.3d at 1362). Therefore, a "claimant must concede the [authorization] of the government action which is the basis of the taking[s] claim to bring suit under the Tucker Act . . . ." *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir.1993).

■ Government agents possess sufficient authorization to implicate the takings clause if "their actions are a natural consequence of Congressionally approved measures, or are pursuant to the good faith implementation of a Congressional Act." *Del–Rio,* 146 F.3d at 1362 (internal quotation marks and citations omitted); *see also Regional Rail Reorg. Act Cases,* 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ("The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government, and hence recovery is not available in the Court of Claims.") (internal quotation marks and citation omitted). Actions outside the normal scope of agency responsibilities are considered *ultra vires, Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1042 (10th Cir. 2001), and cannot give rise to liability for a compensable taking, *Del–Rio,* 146 F.3d at 1362.

■ The Third Amended Complaint, according to plaintiff, does not allege that the USPS was acting *ultra vires* by disclosing to others and utilizing itself the confidential aspects of the Zipster Plus, and defendant's takings analysis conflates illegal actions and unauthorized activities. As plaintiff points

5. The court will analyze defendant's lack of authorization argument, as it cannot credit plaintiff's contention that *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), restricts defendant to raising authorization as an affirmative defense in its answer. *Florida Rock*

demonstrates that it is entirely proper for defendant to deny an agent's authority to bind the Government and does not require the authorization defense to be raised first in defendant's answer. *See* 791 F.2d at 900.

out, the Federal Circuit has "drawn an important distinction between conduct that is 'unauthorized' and conduct that is authorized but nonetheless unlawful." *Del–Rio*, 146 F.3d at 1362. The " 'mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes, even though he is not "authorized" to break the law.' " *Id.* at 1362 (quoting *Ramirez de Arellano v. Weinberger*, 724 F.2d 143, 151 (D.C.Cir.1983), *rev'd*, 745 F.2d 1500 (D.C.Cir.1984) (*en banc*), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985)).[6] Plaintiff thus may bring a takings claim, "as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground." *Rith*, 247 F.3d at 1365.

In the case at bar, plaintiff charges that individual actions by USPS employees resulted in the unlawful disclosure and wrongful conversion of its confidential property. For example, plaintiff alleges that the USPS disclosed components of its trade secret to various competitors to facilitate the development of a Zipster Plus-type machine. Third Am. Compl. ¶¶ 57, 59, 61, 63, 65, 68. The Third Amended Complaint also includes contentions that the USPS never returned the photographs and artist renderings of various Zipster models, and the proposal cataloguing their functional capabilities, that plaintiff submitted to the USPS in 1985. *Id.* ¶¶ 18–19, 21, 24. Furthermore, plaintiff claims that the USPS circulated an altered form of the Zipster Plus SOW at a June 18, 1993 industry meeting and refashioned the putatively proprietary information in the Zipster Plus prototype and SOW into a standard by which the USPS evaluated other free-standing, automated postal machines. *Id.* ¶¶ 47, 60–61, 64.

All of plaintiff's allegations plead misfeasance by USPS employees, but these alle-

gations, however creatively framed, do not imbue their actions with the authorization necessary to predicate a takings claim. First, plaintiff cannot argue successfully that the USPS employees, when disregarding the market test contract's confidentiality clause and misappropriating plaintiff's technology, were acting within either the authority granted by their positions or within the statutory mandate of the USPS. Although plaintiff attempts to characterize these actions as authorized by declaring that "it is self evident that it is well within the USPS's statutory authority 'to evaluate and order improvements in their self-service postal machine development efforts,' " Pl.'s Br. filed Feb. 4, 2003, at 2 (quoting Third Am. Compl. ¶ 64), plaintiff supports this "self evident" principle by citing only one statute. Third Am. Compl. ¶ 64. That statute, 39 U.S.C. § 403(b)(3) (2002), only charges the USPS with the general obligation to ensure ready access to postal service. The Supreme Court has found that "the Government will not be deemed to have ... appropriated private property, merely because some officer ... takes possession of it with a view to effectuating the general purpose of Congress." *United States v. North Am. Transp. & Trading Co.*, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920).

Not only does the Third Amended Complaint fail to put forward statutory authority for the USPS employee misfeasance,[7] it also pleads expressly that the actions in question flout statutes and regulations that define the scope of USPS employee duties. Trade secrets obtained by the USPS enjoy protection from disclosure under both 18 U.S.C. § 1905 (2002), which imposes criminal liability on federal employees who improperly disclose trade secrets obtained during the course of employment, and several USPS regulations, *e.g.*, 39 C.F.R. § 265.6(b)(2) (2002) (exempting trade secrets from mandatory disclosure

**6.** In quoting *Ramirez*, the Federal Circuit noted that the *en banc* D.C. Circuit, although reversing the panel decision authored by Judge (now Justice) Scalia, did not disagree with the panel's analysis of the authorization issue. *Del–Rio*, 146 F.3d at 1362.

**7.** Plaintiff cannot point to any statutory authority granting the USPS the right to disclose plaintiff's trade secret. *See Ruckelshaus*, 467 U.S. at 1020, 104 S.Ct. 2862 (finding that legislative act could effect taking of plaintiff's trade secret); *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 45–46 (1st Cir.2002) (concluding legislative act violated takings clause).

under Freedom of Information Act); 39 C.F.R. § 230.5(d) (2002) (instructing Office of Inspector General to comply with regulations preventing mandatory disclosure of trade secrets); 39 C.F.R. § 7.3(d) (2002) (allowing USPS Board of Governors to close to public portions of Board meetings to avoid disclosing trade secrets). These provisions apply directly to the USPS, so any improper disclosure of plaintiff's trade secret by USPS employees would run afoul of their prohibitions.

"[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The statutory and regulatory authority cited in the Third Amended Complaint confirm that the improper disclosure and conversion of plaintiff's trade secret would lie outside the scope of the USPS employees' duties and could not serve as a basis for a compensable taking. *Custer County Action*, 256 F.3d at 1042; *Del–Rio*, 146 F.3d at 1362.

Analysis of plaintiff's case law warrants the same conclusion. Plaintiff quotes extensively from *Del–Rio* and *Rith*, advocating that both decisions necessitate a denial of defendant's motion to dismiss. To the extent that plaintiff maintains that the decisions underscore the distinction between unauthorized and authorized, but unlawful, agency action, the parties are in accord. However, the contention that these cases are directly apposite to plaintiff's scenario cannot be sustained. Both *Del–Rio* and *Rith* involved, *inter alia*, challenges to agency regulation of plaintiff's property interest. *Del–Rio*, 146 F.3d at 1363; *Rith*, 247 F.3d at 1365. In both cases plaintiff claimed a taking of its regulated property interest, and the court examined whether the agency action required the Government to compensate plaintiff. Thus, plaintiff in both cases was contending that regulations reaching the *res* at issue had effected a regulatory taking of its property.

In the case at bar, plaintiff alleges that its protected, confidential property was subject—not to regulation by the Government— but to activities tantamount to conversion.

Plaintiff's case therefore more closely resembles *Eyherabide v. United States*, 170 Ct.Cl. 598, 345 F.2d 565 (1965), a takings action cited in *Del–Rio*, 146 F.3d at 1363. Plaintiffs in *Eyherabide* sued for a temporary taking of their property, which had the distinction of being surrounded on three sides by a naval gunnery range. Plaintiffs purchased the property, consisting of two houses, a barn, a garage, and several other improvements, five years after the Department of the Navy's lease of that property had expired. Plaintiffs intended to use the property as a headquarters for their sheep-herding and grazing activities in the area.

Unfortunately, word of plaintiffs' purchase apparently was not conveyed to the Naval authorities in charge of the range, as plaintiffs, between 1952 and 1962, saw four of their livestock shot, two fuel tanks dropped an eighth of a mile from one of their houses, and various structures on their property destroyed by rockets and dynamite. The Navy posted signs stating, "DANGER AREA, KEEP OUT," on the roads leading to the ranch and on areas near the ranch buildings. A Naval security guard even went so far as to inform the caretakers hired to maintain the property "that the land belonged to the Government and formed part of the bombing range," 170 Ct.Cl. at 602, 345 F.2d at 568, and that the caretakers were trespassers and subject to arrest.

The Court of Claims concluded that plaintiffs had suffered a compensable temporary taking. In reaching its holding, the court noted:

Nor is this a case in which we can say that the implication of a taking is negated because the actions of the defendant's representatives were wholly unauthorized. The guard who cautioned the caretakers acted within the general scope of his duties, as did the naval personnel who lobbed shells, dropped casings and other objects, and flew over and near the property; the placement of the warning signs was also obviously within the local authority of the gunnery range. No statute or regulation forbade these activities. They cannot be characterized as unauthorized merely be-

cause they may have been mistaken, imprudent, or wrongful.

170 Ct.Cl. at 606, 345 F.2d at 570 (footnote and citations omitted).

*Eyherabide,* although presenting a factual scenario similar to that alleged by plaintiff, insofar as the property at issue was subject to physical invasion by government agents, adheres to the long-standing principle that actions performed by government officials pursuant to a statutory mandate are sufficient to bind the Government to pay just compensation. *Del–Rio,* 146 F.3d at 1362. The Court of Claims in *Eyherabide* pointed out that "[t]he 11th Naval District, which had jurisdiction over the gunnery range, was authorized to acquire leasehold interests." 170 Ct.Cl. at 606 n. 8, 345 F.2d at 570 n. 8. Thus, the court rested its decision on an imputed exercise of lawful authority. Imputed were the acts of local Naval personnel, "whatever the higher officials may have thought," 170 Ct.Cl. at 605, 345 F.2d at 569, to treat plaintiff's property as part of the greater range. Plaintiff in the instant case would impute in the same manner the USPS personnel's unlawful acts to the USPS in the discharge of its authorized activity to develop parcel mailing machines.

The similarity that plaintiff cannot allege, however, is the required characterization of the employees' actions. In *Eyherabide,* for example, the Naval personnel were not vandals. Indeed, the court distinguished acts of vandalism (for which the Government, having run off the caretakers, ultimately was responsible). 170 Ct.Cl. at 606, 345 F.2d at 570. Plaintiff, in contrast, pleads acts of conversion on the part of the USPS personnel. These identified employees had only one motivation, according to the complaint: to purloin plaintiff's device by violating the terms of the confidentiality clause. If the Third Amended Complaint were construed to plead a taking, the Government would be at the mercy of renegade employees and required to answer as an insurer to a takings claim. Under plaintiff's theory every conver-

sion would be a taking if the agency were to exploit what had been wrongfully appropriated. *Eyherabide* does not counsel this broad reading. When government officers or employees act in contravention of their duties or positions, their actions cannot give rise to a takings claim. *Cf. Larson,* 337 U.S. at 689, 69 S.Ct. 1457; *Hooe v. United States,* 218 U.S. 322, 335–36, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055 (1910); *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 44–45, 576 F.2d 317, 319–20 (1978).

Plaintiff essentially alleges two misdeeds by the USPS: first, breach of the market test contract's confidentiality provision and oral assurances of confidentiality; and second, conversion of plaintiff's trade secret. *See* Third Am. Complaint ¶¶ 76(a), (b). Plaintiff has not shown that USPS employees were authorized to breach the confidentiality provision by disclosing plaintiff's proprietary information to its competitors.[8] Plaintiff cites no statute or regulation authorizing the USPS to transform attributes of the Zipster Plus into a USPS standard for an automated postal machine (or to plagiarize plaintiff's SOW for the Zipster), nor has plaintiff claimed that the USPS authorized its employees to undertake such actions in order to expedite the production of postal machines by plaintiff's competitors. Plaintiff, in short, has alleged breach of contract due to a conversion, a claim over which this court has jurisdiction, despite the tortious nature of the breach. *See Wood v. United States,* 961 F.2d 195, 198 (Fed.Cir.1992); *San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 960 (Fed.Cir.1989); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1576 (Fed.Cir.1984).

Because unauthorized actions cannot predicate liability for a taking, plaintiff's Third Amended Complaint must be dismissed.

## CONCLUSION

In reviewing a motion to dismiss for failure to state a claim, a trial court must dismiss the complaint if the "facts asserted by the

---

**8.** Plaintiff, however, has shown that USPS employees were authorized to enter into the test market contract with plaintiff and has alleged that these employees breached the confidentiality clause of the contract. Whether the activities constituting the breach were tortious is immaterial to the court's analysis of the breach claim.

plaintiff do not entitle him to a legal remedy." *Sommers Oil,* 241 F.3d at 1378 (citing *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000)). Thus, it is plaintiff's burden to state facts in its complaint that constitute a cognizable cause of action. The Third Amended Complaint contains sufficient allegations, when taken as true, to avoid dismissal on defendant's contractual remedy and public use arguments. However, the court finds no allegations that adequately imbue the USPS's actions with the requisite authorization necessary to support a takings claim. The court has afforded plaintiff two opportunities to justify proceeding on its takings claim, yet the Third Amended Complaint omits an essential component of such a cause of action. The Third Amended Complaint consequently must be dismissed for failure to state a claim.

The dismissal of plaintiff's takings claim has implications for the breach of contract findings previously made by the court in its liability opinion. The court dismissed plaintiff's claims for wrongful termination, frustration of purpose, hindrance of performance, and breach of good faith and fair dealing. *Pi Elecs.,* 54 Fed.Cl. at 62–64. Defendant prevailed on its counterclaims for the advertising advance and the royalty fee, less a refund due to plaintiff for fees that it incurred in preparing mailers for an aborted advertising campaign. *Id.* at 72. Regarding plaintiff's breach claim based on wrongful disclosure of proprietary information, the court found that defendant had been unable during the 2000 evidentiary hearing to corroborate Mr. Dajani's testimony. Defendant used other witnesses in the supplemental evidentiary proceeding to attempt to establish that the USPS possessed working knowledge, before being introduced to the Zipster Plus, of the features that plaintiff claims are proprietary to its machine, but the court found this testimony and related forensic evidence inconclusive. *Id.* at 70–71. Thus, the court was presented with two alternatives:

> [T]o decide the case on the extant theories, or to treat defendant's evidentiary lapse as the predicate for reopening the proceedings to allow plaintiff's takings theory. Both plaintiff's penultimate counsel and defendant's second counsel, who conducted the 2000 evidentiary proceeding, argued at that time for reopening of proofs. After much misgiving about continuing the proceedings on liability, the court must concur .... The findings on plaintiff's proprietary information are therefore tentative and offered only for the parties' guidance.

54 Fed.Cl. at 71 (internal cross-reference omitted).[9] Accordingly,

**IT IS ORDERED,** as follows:

1. Plaintiff's Third Amended Complaint is dismissed in its entirety for failure to state a claim upon which relief can be granted.

2. Plaintiff's Amended Complaint, filed March 31, 1998, is reinstated in its entirety.

3. Trial on liability shall be limited to two issues: 1) plaintiff may rest on the proofs put forth in the liability trial, and defendant may introduce evidence that the USPS's in-house SOWs or other self-service mailing machines predated every feature that plaintiff has shown to be unique or proprietary to the Zipster Plus; and 2) the court will determine damages for breach of contract, as well as damages on defendant's counterclaims.

4. A scheduling order has been entered separately this date.

---

9. The court's findings relevant to the breach of the confidentiality provision of the market test contract were "subject to revision or supersession based on evidence developed in a future trial on plaintiff's taking[s] claim." *Id.* at 73, ¶ 2. However, as the case will not include a takings claim, reopening all aspects of liability is no longer justified.